UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                      :

DANIEL FUSCO and DIANE FUSCO,       :

              Plaintiffs,            :

          - against -           :

NORTHPOINT ERM LLC, NORTHPOINT    :
SOFTWARE VENTURES, INC., REBECCA    :
CHAPMAN as the EXECUTOR OR        :
ADMINISTRATOR OF THE ESTATE OF     :
DAVID L. CHAPMAN, REBECCA CHAPMAN  :
(in her individual capacity), SALLY DUNGAN,  :
and RICHARD GAFFEY,                :

              Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Civil Action No. 3:15 cv 289

**COMPLAINT**

**Jury Trial Demanded**

        Plaintiffs Daniel Fusco and Diane Fusco, upon their own personal knowledge, state and allege as follows:

## INTRODUCTION

        1.     This action is brought by plaintiffs Daniel Fusco and Diane Fusco against defendants NorthPoint ERM LLC ("NorthPoint"), NorthPoint Software Ventures, Inc., the estate of NorthPoint's former (and now apparently deceased) owner and Chief Executive Officer David L. Chapman, NorthPoint's current Chief Executive Officer, Rebecca Chapman, and NorthPoint's apparent owners and/or directors Sally Dungan and Richard Gaffey.  The defendants, acting in concert and as part of a conspiracy, have committed egregious violations of the Fair Labor Standards Act and state wage and hour laws, breached employment contracts with plaintiffs, and perpetrated a massive fraud on plaintiffs and their other employees.

1

2.      From September 2014 to present, a period of over 8 months, plaintiffs

have worked full-time for NorthPoint for *no pay*.  That is, in the course of the entire

period that plaintiffs have worked for NorthPoint, they have not received a single dollar

of compensation, despite routinely working in excess of 40 hours per week.  In addition,

by virtue of defendants' fraud and violations of applicable law, plaintiffs' future

employment prospects have been badly damaged and they have depleted their savings in

order to provide for themselves while working for NorthPoint.

3.      Plaintiffs were induced to accept jobs with NorthPoint based on the

fraudulent misrepresentations of defendant David Chapman, and have been fraudulently

induced to continue working for NorthPoint because of the fraudulent misrepresentations

of defendant David Chapman and the other defendants.  Among other things, the

defendants fraudulently misrepresented NorthPoint's business, revenue prospects, assets,

and financial condition.  Indeed, it does not even appear that "NorthPoint ERM LLC,"

which the defendants represented as the legal form of the business entity, is an

incorporated or legal entity.

4.      Moreover, during plaintiffs' employment, defendant David Chapman

continuously promised, both orally and in writing, that plaintiffs would be compensated

with "adult money" consisting of hundreds of thousands, if not millions, of dollars once

certain deals produced revenue for the company, despite the fact that defendants knew

that such deals would never materialize.  In one particularly egregious example, plaintiffs

were told that the company had signed a "$6.9 million" deal with an entity called EXL

Services, which deal would result in substantial monies for plaintiffs.  In fact, and as

defendants well-knew, there was no such $6.9 million deal.  Rather than attempt to close

deals or generate revenue for NorthPoint, defendants actually undermined NorthPoint's ability to generate revenue and thwarted their employees' ability to close deals or earn commissions. Defendant Chapman also disclosed to other NorthPoint employees that, contrary to his promises to plaintiffs, he *never* intended to compensate plaintiffs for their work for the company.

5.     To make matters worse, defendants misrepresented NorthPoint's operational structure, failed to respect corporate formalities, failed to create, maintain, and/or abide by NorthPoint's governing and operational documents, failed to capitalize NorthPoint properly, failed to maintain proper books and records of the company, and at one time refused even to disclose to the employees the identity of the present owners, shareholders, or directors of the company. Accordingly, plaintiffs seek, in this action, to pierce the corporate veil of NorthPoint (assuming it has one) and hold the individual defendants personally liable for all of the damages claimed in this action.

6.     NorthPoint, under the control and direction of defendants, has also breached its employment contracts with plaintiffs. Plaintiffs have not received the compensation that they were promised under their employment contracts, and have not been reimbursed for all of their corporate expenses as required by the contracts.

7.     Plaintiffs bring this action pursuant to the Fair Labor Standards Act, and to recover damages for, among other things, defendants' fraudulent inducement, fraud, breach of contract, and violations of the North Carolina and Florida Unfair and Deceptive Trade Practices Acts. Plaintiffs seek actual, compensatory, contractual, liquidated, statutory, treble, and punitive damages, declaratory and injunctive relief, emotional

3

distress damages, as well as the reasonable attorneys' fees and costs incurred in bringing this action.

## THE PARTIES

**Plaintiff Daniel Fusco**

8.      Plaintiff Daniel Fusco is an adult individual residing in Waxhaw, North Carolina, which is within this district, and is an employee of defendants.  Mr. Fusco has over 30 years of experience in international and domestic business development and strategic partner management.  Prior to joining NorthPoint in or about October of 2014, Mr. Fusco worked for AT&T, Lucent Technologies, and Avaya Inc.  Mr. Fusco was recruited to work for defendants by David Chapman because of his prior successes in business development and related areas.  Mr. Fusco is the brother of plaintiff Diane Fusco.

**Plaintiff Diane Fusco**

9.      Plaintiff Diane Fusco is an adult individual residing in the state of Florida, an employee of defendants, and the sister of plaintiff Daniel Fusco.  Ms. Fusco has worked extensively as a consultant with, and a partner of, Fortune 500 companies, to design and implement business transformation solutions.  Prior to joining NorthPoint in or about September 2014, Ms. Fusco worked for Cisco, Avaya, and United Parcel Service.  She was recruited to work for defendants by David Chapman because of her prior successes in implementing business solutions and in other related areas.

**Defendant "NorthPoint ERM LLC"**

10.      Defendants do business under the name "NorthPoint ERM LLC." Defendants list this name on their corporate website, sign documents and agreements

4

using this name, and use this name in their correspondence and in their email signature blocks. Defendants have represented to plaintiffs that "NorthPoint ERM LLC" is a limited liability company organized under the laws of the State of Delaware. However, plaintiffs have been unable to locate a listing for "NorthPoint ERM LLC" through the Delaware Secretary of State. Thus, Plaintiffs allege that "NorthPoint ERM LLC" is not actually an incorporated entity. Upon information and belief, "NorthPoint ERM LLC" does not have any owner, member, or director who is a resident of the states of North Carolina or Florida. Upon information and belief, the owners, members, and/or directors of "NorthPoint ERM LLC" are residents of the states of New Hampshire, Massachusetts, and/or South Carolina.

**Defendant NorthPoint Software Ventures, Inc.**

11.     Defendant NorthPoint Software Ventures, Inc. is a Delaware corporation and, upon information and belief, is an affiliated entity of "NorthPoint ERM LLC." Plaintiffs suspect and, upon information and belief, allege that defendants have been using NorthPoint Software Ventures, Inc. as a corporate vehicle to further the fraud complained of in this action.

**Defendant Rebecca Chapman as the Executor or Administrator**
**of the Estate of David L. Chapman**

12.     Defendant Rebecca Chapman is, upon information and belief, an Executor or Administrator of the Estate of David L. Chapman. Mr. Chapman was, until May 2015, the Chief Executive Officer of NorthPoint ERM LLC and, upon information and belief, the controlling stockholder. Plaintiffs also allege, upon information and belief, that Mr. Chapman was the controlling officer, director, and/or shareholder of NorthPoint Software Ventures, Inc. Mr. Chapman managed the day to day activities of the entities and is

5

responsible for much of the fraud and other illegal conduct complained of in this action. A few months ago, plaintiffs and the other employees' of defendants began complaining about the manner in which they have been treated by defendants, and the fact that they have not been paid for their work. Plaintiffs and the other employees began asking for documents and information concerning the corporate structure, business, assets, and transactions being engaged in by the company. Weeks later, on or about May 5, 2015, defendants announced that Mr. Chapman had passed away. Prior to his death, Mr. Chapman was, upon information and belief, a resident of the state of New Hampshire. This action is brought against Mr. Chapman's estate by naming and effectuating service upon Rebecca Chapman as Mr. Champan's Executor.

**Defendant Rebecca Chapman**

13.     Upon information and belief, defendant Rebecca Chapman is an adult individual residing in the state of South Carolina. She is the daughter of David Chapman and is an owner, officer, director, member and/or shareholder of NorthPoint ERM LLC. After Mr. Chapman's death, Ms. Chapman became the Chief Executive Officer of NorthPoint, with responsibility for, and authority over, the management and day-to-day operations of the entity. As such, Ms. Chapman supervises and controls the employment of NorthPoint employees located in the state of North Carolina. Ms. Chapman represented to NorthPoint's employees that she was first appointed or elected to the position of Chief Executive Officer by defendants Dungan and Gaffey. Upon information and belief, Ms. Chapman was elected or appointed to the position of Chief Executive Officer without the observance of corporate formalities. Ms. Chapman's authority apparently includes, among other things, the authority to hire, fire, and

discipline employees. Ms. Chapman has control over the employee's pay and benefits and the employment practices of the company. Ms. Chapman is personally liable for the company's unlawful employment practices, and its fraudulent conduct and breach of its contracts, as further set forth herein. Ms. Chapman is sued both as the Executor of the estate of David Chapman and in her own individual capacity.

**Defendant Sally Dungan**

14.     Upon information and belief, defendant Sally Dungan is an adult individual residing in the state of New Hampshire. She was the fiancée of David Chapman and, upon information and belief, is an owner, officer, director, member and/or shareholder of NorthPoint ERM LLC. Upon information and belief, and according to Ms. Chapman, Ms. Dungan first elected or appointed Ms. Chapman to the role of Chief Executive Officer of the company. Ms. Dungan thus has control over the company, including control over the employees' pay and benefits and the employment practices of the company. As such, Ms. Dungan supervises employees located in the state of North Carolina. Ms. Dungan is personally liable for the company's unlawful employment practices, and its fraudulent conduct and breach of its contracts, as further set forth herein.

**Defendant Richard Gaffey**

15.     Upon information and belief, defendant Richard Gaffey is an adult individual residing in the state of Massachusetts. Upon information and belief, he has had a long-standing relationship with the Chapman family and is an owner, officer, director, member and/or shareholder of NorthPoint ERM LLC. Upon information and belief, and according to Ms. Chapman, Mr. Gaffey first elected or appointed Ms.

Chapman to the role of Chief Executive Officer of the company. Mr. Gaffey has control over the company, including control over the employees' pay and benefits and the employment practices of the company. Mr. Gaffey is personally liable for the company's unlawful employment practices, and its fraudulent conduct and breach of its contracts, as further set forth herein.

## JURISDICTION AND VENUE

16. This action arises, in substantial part, under the FLSA, 29 U.S.C. §201 *et. seq.* The court has jurisdiction over this matter pursuant to 29 U.S.C. §216(b) and 28 U.S.C. §1331.

17. Alternatively, the Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.

18. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

19. Venue is proper in this District pursuant to 28 U.S.C. §1391 because plaintiff Daniel Fusco resides in this District, defendants do business in this District, defendants maintain an office in this District (as reflected, among other places, on NorthPoint ERM LLC's website), and some of the unlawful practices were committed, and certain relevant employment records are maintained, in this District.

## FACTUAL ALLEGATIONS

**Plaintiff Daniel Fusco Is Fraudulently Induced
To Begin Working For NorthPoint**

20. Plaintiff Daniel Fusco is an adult male, is married, and has two children who are currently in college.

8

21.     On or about September 14, 2014, Mr. Fusco began discussing the concept of becoming an employee of NorthPoint ERM LLC with defendant David Chapman.

22.     In the course of those discussions, Mr. Chapman represented NorthPoint ERM LLC as being a data analytics enterprise that assists clients with risk management assessment.  Upon information and belief, NorthPoint ERM LLC is the owner of, and potentially holds intellectual property rights to, certain software designed for this purpose.

23.     Mr. Chapman further stated that the company earns revenue by recommending to its clients that they undertake "Software Power Offerings" using NorthPoint's software product.   If a client agrees, NorthPoint would then supposedly supply software which could be used by the client to run successive risk assessments, costing approximately $80,000 per assessment.

24.     Upon information and belief, Mr. Chapman was interested in hiring Mr. Fusco to become an employee of NorthPoint because of Mr. Fusco's substantial background and experience in business development and other related areas.  Among other things, Mr. Fusco had previously worked in business development for AT&T, Lucent Technologies, and Avaya Inc.  Mr. Chapman informed Mr. Fusco that Mr. Fusco was being recruited to work for NorthPoint ERM LLC to assist NorthPoint in furthering the company's business with Cisco Systems, Inc.

25.     NorthPoint's goal was to sell Cisco "Software Power Offerings" that Cisco could then re-sell to its clients and customers.  NorthPoint would then earn revenue both on the sale of its software product to Cisco, and on Cisco's selling "assessments" to

9

Cisco's own clients and customers using NorthPoint's software product to provide the "assessments."

26.     During Mr. Chapman's recruitment of Mr. Fusco, he intentionally made a number of false and fraudulent statements to induce Mr. Fusco to accept employment with NorthPoint.

27.     Mr. Chapman represented to Mr. Fusco that NorthPoint had a deal with a company called EXL Services that would provide substantial revenue for NorthPoint. This statement was knowingly false.

28.     Mr. Chapman represented to Mr. Fusco that Cisco was a "live account" that would generate "adult money" for NorthPoint in the calendar year 2015. Mr. Chapman told Mr. Fusco that the Cisco account alone would generate "millions of dollars" for NorthPoint in 2015, and that 20% of the monies generated from the Cisco account would go to Mr. Fusco as the leader of the Cisco account. These statements were knowingly false. No deal with Cisco had, or ever has, been signed, and NorthPoint has generated no revenue from business dealings with Cisco.

29.     Mr. Chapman represented to Mr. Fusco that, as a result of NorthPoint's existing, ongoing business relationships, other employees of NorthPoint had earned over $900,000 per year. This statement was knowingly false. NorthPoint has never had real ongoing business relationships with other entities, has never generated any significant revenue, and NorthPoint's other employees have also been working for no pay. Upon information and belied, no NorthPoint employee has ever earned anywhere near $900,000.

30.     In addition, Mr. Chapman represented NorthPoint as a real company, with governing agreements, stock plans, a board of directors, verified accounting, books and records, properly maintained balance sheets, and customers.  These statements were knowingly false.  The company has not followed a stock plan, has no properly functioning board of directors, does not properly maintain its books and records, conducts limited, if any, verified accounting, and routinely fails to file regulatory documents or make required filings.  Plaintiffs have never seen the company's supposed operating agreement despite asking for it on a number of occasions.  The company also fails to keep accurate books and records of the supposed board of director meetings.

31.     If Mr. Chapman had not made, among others, the false and fraudulent representations set forth above, Mr. Fusco would never have accepted employment with the company.  Mr. Fusco therefore relied, to his detriment, on false statements Mr. Chapman made in deciding to accept employment with NorthPoint.

32.     As a result of Mr. Chapman's false and fraudulent statements, Mr. Fusco commenced his employment with NorthPoint in or about October 2014.

**Plaintiff Diane Fusco Is Fraudulently Induced
To Begin Working For NorthPoint**

33.     Diane Fusco is an adult female individual.  She supports both herself and her elderly mother who is dependent upon Ms. Fusco for her basic necessities and supplemental medical care.

34.     On or about August 16, 2014, Ms. Fusco was approached about becoming an employee of NorthPoint by David Chapman via the internet service "LinkedIn."  Ms. Fusco subsequently had a number of interviews with Mr. Chapman and discussions about the particulars of her role within NorthPoint on the telephone and via email.

11

35.     Upon information and belief, Mr. Chapman was interested in hiring Ms. Fusco to become an employee of NorthPoint because of Ms. Fusco's substantial background and experience in consulting and transformational business solutions. Among other things, Ms. Fusco had previously worked for Cisco Systems Inc., Avaya Inc., and the United Parcel Service.  Mr. Chapman told Ms. Fusco that, among her other duties and responsibilities, she would be the lead NorthPoint employee on the EXL Services account and would be tasked with furthering and supporting the company's business with EXL Services.

36.     During Mr. Chapman's recruitment of Ms. Fusco, he intentionally made a number of false and fraudulent statements to induce Ms. Fusco to accept employment with NorthPoint.

37.     On or about August 29, 2014, Mr. Chapman represented to Ms. Fusco that NorthPoint had signed a $6.9 million dollar deal with EXL Services.  Mr. Chapman told Ms. Fusco that, as the lead employee on the EXL Services account, she would receive 15% of the monies generated from the account.  Thus, Mr. Chapman represented to Ms. Fusco that, because of the EXL Services deal alone, Ms. Fusco would receive $1,035,000.  These statements were knowingly false.  No $6.9 million deal had, or ever has, been signed with EXL Services and no significant monies have been generated for NorthPoint as the result of any deal with EXL Services.

38.     On or about September 18, 2014, Mr. Chapman represented to Ms. Fusco that NorthPoint's stock options, while reflecting a par value of one cent per share, could be fairly valued at $10 per share, and that there was $14 million of NorthPoint stock available to be distributed.  Mr. Chapman represented to Ms. Fusco that some of this

stock would be distributed to NorthPoint's employees over time and pursuant to a corporate stock plan. These statements were false. NorthPoint's stock has never been, and could never be, valued at $10 per share given the current condition of the company, there has never been $14 million worth of available stock.

39.     Notably, Mr. Chapman told Ms. Fusco that defendant Gaffey, who he claimed was a member of NorthPoint's board of directors, was in charge of NorthPoint's stock plan and responsible for valuing and distributing NorthPoint's stock. Therefore, plaintiffs allege, upon information and belief, that Mr. Gaffey aided and abetted the fraudulent conduct complained of herein by knowingly misrepresenting the availability of, and value of, NorthPoint's stock. Upon information and belief, Mr. Gaffey prepared and maintained false and fraudulent documents and records to accomplish this purpose.

40.     Mr. Chapman also represented to Ms. Fusco that Deloitte was close to retaining NorthPoint's services, and that the Deloitte account would also generate substantial revenue for NorthPoint. This statement was knowingly false. Deloitte was never close to retaining NorthPoint to provide any products or services.

41.     In addition, Mr. Chapman represented NorthPoint as a real company, with governing agreements, stock plans, a board of directors, verified accounting, books and records, properly maintained balance sheets, and customers. These statements were false. The company does not follow a stock plan, has no properly functioning board of directors, does not properly maintain its books and records, conducts limited, if any, verified accounting, and routinely fails to file, or falsely files, regulatory and tax documents. Plaintiffs have never seen the company's supposed operating agreement,

despite asking for it on a number of occasions. The company also fails to maintain accurate minutes of its supposed board of director meetings.

42. If Mr. Chapman had not made, among others, the false and fraudulent representations set forth above, Ms. Fusco would never have accepted employment with the company. Ms. Fusco therefore relied, to her detriment, on false statements Mr. Chapman made in deciding to accept her employment with NorthPoint.

43. As a result of Mr. Chapman's false and fraudulent statements, Ms. Fusco commenced her employment with NorthPoint in or about September 2014.

**As A Result Of Mr. Chapman's False Statements**
**Plaintiffs Enter Into Employment Contracts With NorthPoint**

44. As a result of Mr. Chapman's knowingly false representations, plaintiffs went to work for NorthPoint pursuant to employment contracts that they executed with the company.

45. Plaintiff Daniel Fusco executed an employment agreement with NorthPoint ERM LLC on or about October 29, 2014, and plaintiff Diane Fusco executed an employment agreement with NorthPoint ERM LLC on or about September 24, 2014.

46. Plaintiffs' employment agreements with NorthPoint contain various provisions relating to their compensation. Specifically, plaintiffs' employment agreements provide that they are entitled to be compensated with base salaries, commissions, bonuses, and an initial grant of 50,000 stock options each. The agreements also provide for plaintiffs to be reimbursed for the expenses they incur in the furtherance of the company's business.

47. The employment agreements provide that plaintiffs' base "salary at this time," *i.e.*, the time of the execution of the agreements, was $0. However, Mr. Chapman

informed plaintiffs that they, and the other NorthPoint employees, would begin receiving salary as soon as revenue was received from, among other places, the signed $6.9 million EXL Services deal. Mr. Chapman attributed the company's inability to pay an immediate base salary to the delay between the date the EXL Services agreement was signed and the date that NorthPoint would begin receiving revenue under the deal. Mr. Chapman stated that revenue would begin coming in from the EXL Services, and other deals, and that employees would begin receiving salaries, within a few months of plaintiffs' execution of their employment agreements.

48. Plaintiffs' employment agreements contain provisions tracking Mr. Chapman's representations. For example, while plaintiffs' initial salary is listed as "$0," the agreement provides that they will receive annual base salaries "of $125,000 -- $135,000 yearly with an objective of NorthPoint company bonuses to bring the target to a total of $150,000 -- $160,000 for *the first full year*." (emphasis supplied.) Thus, despite their agreements listing plaintiffs' initial salaries as "$0," the parties contemplated, and the agreement provides, that plaintiffs would receive a base salary of $125,000-$135,000 and a target bonus of at least $25,000 in the first year of their employment.

49. In addition, the employment agreements provide for plaintiffs to receive four different types of commissions: (i) commissions based on sales of services to clients and business partners; (ii) commissions based on the amount NorthPoint receives in revenue share from its business partners' sales of services; (iii) commissions based on NorthPoint's software product licenses to its customers and business partners; and (iv) commissions based on the amount NorthPoint receives in revenue share from its business partners' software product licenses to third-parties.

50.     Plaintiffs' employment agreements further provide for plaintiffs to receive "Stock Options in the amount of 50,000 shares at the time of acceptance of this offer. In addition, an opportunity exists to earn 100,000 additional stock options based on performance in the first 12 months." Mr. Chapman represented that the value of the company's stock could fairly be valued at $10 per share. Thus, plaintiffs were each contractually entitled to receive a grant of $500,000 in stock options at the time they accepted the company's offer, with the possibility of each getting another $1,000,000 in stock options within the first year. Defendants have either refused to issue the stock options and/or have interfered with their vesting.

51.     Further, the stock options granted to plaintiffs would, once exercised, have carried with them voting rights, thereby giving plaintiffs and NorthPoint's other employees a voice in the management and direction of the company. Indeed, if defendants had not wrongfully violated plaintiffs' rights, it could be unclear at this juncture who would have control of the company.

52.     Moreover, the initial and subsequent options grants were designed to protect the employees in the event that the company was sold or transferred. Mr. Chapman, in writing, represented that the value of the company was "$64 million." In any sale or transfer of the company, plaintiffs would be entitled to their "pro rata" share of the company's valuation or sale price by virtue of the fact that they are entitled to shares in the company. In the event that 100% of the company has been transferred any of the other defendants or any third-party as a result of Mr. Champan's death, plaintiffs are entitled to receive their "pro rata" share of the $64 million valuation Mr. Chapman placed on the company, in writing, just prior to its transfer.

53.     Plaintiffs' employment agreements also entitle them to be fully reimbursed for company expenses, including telephone, telefax, internet access service, office supplies, and client related business and entertainment expenses.

**NorthPoint Breaches Plaintiffs' Employment Contracts And**
**Defendants Violate The Fair Labor Standards Act And State Wage Laws**

54.     Contrary to Mr. Chapman's knowingly false representations to plaintiffs, there was no signed "$6.9 million" EXL Services deal, Cisco was not a "live account," and NorthPoint did not have any revenue producing business.  Plaintiffs received no money from these, or any other, accounts as had been promised by Mr. Chapman or as had been promised under their employment agreements.    In fact, Plaintiffs have not received a *single dollar* in compensation during the entirety of their employment with NorthPoint, despite routinely working in excess of 40 hours per week.

55.     In addition, NorthPoint repeatedly breached its employment agreements with plaintiffs.

56.     NorthPoint breached its employment agreements with plaintiffs by failing to pay plaintiffs $150,000 - $160,000 each, in base compensation and bonuses, in plaintiffs' first year of employment.

57.     NorthPoint breached its agreements with plaintiffs by either failing to grant the promised stock options and/or interfering with plaintiffs' rights to own stock in the company.  As Mr. Chapman valued NorthPoint's stock at $10 per share, each plaintiff has been damaged in the amount of $500,000.  In addition, plaintiffs have wrongfully been deprived of a voice in the company by virtue of not having the stock's voting rights.

58.     NorthPoint breached its employment agreements with plaintiffs by failing to fully reimburse plaintiffs for the expenses they incurred in furtherance of NorthPoint's

business.  Indeed, defendant Rebecca Chapman has stated that the company will not be reimbursing plaintiffs for their expenses because the company lacks the funds to do so.

59.	Defendants have also violated the Fair Labor Standards Act, the North Carolina Wage and Hour Act, and the Florida Minimum Wage Act, by failing to pay plaintiffs a minimum wage of at least $7.25 per hour and by failing to pay plaintiffs overtime wages at the rate of time-and-one-half their regular and customary hourly rate.

60.	By virtue of their position as owners, officers, directors, and/or members of the corporate entities, the individual defendants named herein are jointly and severally liable under the Fair Labor Standards Act and state wage and hour laws for the damages incurred by Plaintiffs.  In particular, defendants Dungan, Gaffey, and Rebecca Chapman have controlled the employees and the company's employment practices after Mr. Chapman's death and, therefore, are liable under the FLSA.

**Defendants Engage In Fraud**
**And Unfair And Deceptive Trade Practices**

61.	As the months wore on without plaintiffs receiving their promised compensation, plaintiffs became more concerned about the delay they were experiencing in receiving their compensation.  Among other things, plaintiffs experienced significant emotional distress because they were concerned about the fact that they were not receiving compensation and had to dip into their savings in order to provide for themselves and their families.  As a result, plaintiffs repeatedly sought assurances from Mr. Chapman that their compensation would be forthcoming.

62.	Mr. Chapman responded by making a plethora of knowingly false representations designed to mislead plaintiffs and to induce them into remaining with the company.  Mr. Chapman repeatedly stated that the company was on the cusp of receiving

substantial revenue from its business deals and would shortly be paying all of the compensation it owed to plaintiffs. But, as Mr. Chapman well-knew, his statements were false. The company had no significant deals in place or in the pipeline, and was not in a position to pay compensation to plaintiffs and its other employees.

63.     For example, Mr. Chapman repeatedly stated that "adult money" was about to come in from Cisco and/or EXL Services and, as a result, plaintiffs were about to receive their compensation. As Mr. Chapman knew, this was false. No deal had been made, or was imminent, with Cisco and no significant money was coming in from EXL Services.

64.     Mr. Chapman also represented that deals with KPMG, Deloitte, and IBM were in the process of being procured and about to close. This too was false. No deals were in the process of being procured with any of these entities.

65.     Mr. Chapman also continued to represent that a "$6.9 million" deal had been signed with EXL Services and that, over the next 6 years, business from EXL Services was anticipated to total $250,000,000. Again, this was false, and Mr. Chapman knew it to be false.

66.     Mr. Chapman repeatedly represented that the company had a valuation of $64 million. This was untrue.

67.     To induce plaintiffs to stay at the company, Mr. Chapman repeatedly told plaintiffs that they would be receiving millions of dollars in compensation. However, at the same time, Mr. Chapman told other NorthPoint employees that *he never had any intention to pay plaintiffs* and that, if money did come into the company, he would use it for other purposes or leave it in the company's accounts.

68.     Moreover, Mr. Chapman, during his lifetime, and the new owners and officers Rebecca Chapman, Dungan, and Gaffey, have done nothing but thwart the company's ability to develop business.  Mr. Chapman's poor communication and management skills repeatedly undermined any ability the company may have had to develop business or to sell its products and services.  For her part, Ms. Chapman appears to have no experience, training, or education that would be in any way relevant to the endeavor.

69.     Mr. Chapman, and other defendants, also repeatedly misrepresented the corporate structure, corporate foundation, and pertinent governance documents.  For example, the defendants have repeatedly made reference to a corporate "operating agreement," that, upon information and belief, does not exist or is not being followed.

70.     Defendant Rebecca Chapman has represented that she was first elected or appointed to the position of Chief Executive Officer of the company by defendants Dungan and/or Gaffey.  Yet, upon information and belief, Ms. Chapman assumed the role of Chief Executive Officer without the company engaging in any corporate formalities.

71.     Similarly, "Randy" Chapman, another of the Chapman children, appears to have recently been elevated to the position of "Chairman" of the company without the company engaging in any corporate formalities.  In addition, it appears that Randy Chapman has been conducting himself in a manner calculated to mislead third-parties into thinking that he is his father.

72.     Defendants represented that monthly "Board of Director" meetings that included Gaffey, and presumably included the Chapman defendants and defendant Dungan, were taking place at Gaffey's office.  Upon information and belief, these

supposed "Board of Director" meetings were never held and/or no accurate minutes of these supposed meetings were maintained.

73.     Additionally, defendants Dungan, Rebecca Chapman, and Gaffey, acting in concert, have aided and abetted, and sought to conceal, the fraud perpetrated by the other defendants.  Upon information and belief, these defendants maintained false and fraudulent books and records and prepared false and fraudulent corporate, regulatory, and/or tax filings in an effort to conceal the fraud committed by Mr. Chapman and NorthPoint.  In addition, upon information and belief, defendant Gaffey has falsely created and/or maintained documents relating to the company's stock.

74.     Defendants Dungan, Rebecca Chapman, and Gaffey also fraudulently concealed the fraud taking place at NorthPoint by failing or refusing to provide corporate governance agreements, stock certificates, minutes of Board of Director meetings, books and records of the corporation, and other material information to plaintiffs despite plaintiffs' request for such information.  These defendants have refused even to tell plaintiffs what defendant Dungan's ownership interest is the company, who has controlling authority of the company's shares, or to provide the identity of all of the Board of Directors or the corporate resolutions or other authorizing documents through which Rebecca Chapman allegedly became Chief Executive Officer of the company and Randy Chapman allegedly became its Chairman.

75.     In sum, since seizing control of the company, defendants Dungan, Rebecca Chapman, and Gaffey have continued to represent to the employees that NorthPoint ERM LLC is a real company with structure, organization, and corporate

controls, and a company that observes corporate formalities. In reality, the entity (if it even exists as a formal legal entity) is a sham.

76.     Defendants have failed to observe corporate formalities, to maintain proper and accurate books and records, to create and effectuate the filing of accurate tax and regulatory documents, and have abused and misused the corporate form. As such, it is proper to hold that the corporate form of the defendant entities (if one exists) should be disregarded, and to determine that the entities are mere "alter egos" of the individual defendants. The Court should pierce the corporate veil (if one exists) of the entities and hold the individual defendants liable for all of the entities' unlawful conduct and all the damages sought in this action.

77.     Recently, plaintiffs have been told by defendant Rebecca Chapman that the company has no money and is not able to pay the compensation that it owes to its employees. Yet, upon information and belief, none of the individual defendants have taken any steps to sell the company or its assets (including its software and other intellectual property assets) in order to pay plaintiffs their owed compensation.

78.     Defendants Sally Dungan and Rebecca Chapman have also stated and implied that plaintiffs are not valuable to the company and would not be entitled to any significant monies, even if revenue came in to the company. For example, Rebecca Chapman recently told plaintiffs not to take any further action with the Cisco account so that, in the unlikely event that significant monies come in from Cisco, the defendants could cut plaintiffs out of receiving any compensation from the deal. When Ms. Fusco recently asked Ms. Chapman what Ms. Fusco's incentive is to continue working for the company, Ms. Chapman replied: "I don't know."

79.     As has now become clear, defendants never had any intention of fulfilling their promises to plaintiffs.  Defendant Chapman fraudulently induced plaintiffs into taking jobs with NorthPoint so that they could utilize plaintiffs' knowledge and experience to generate revenue for NorthPoint while scheming to deprive plaintiffs of any compensation.  Defendants repeatedly lied to plaintiffs about the condition of the company, its business, its revenue, and its assets to accomplish their scheme.  When plaintiffs contemplated leaving the company, defendants repeatedly represented to plaintiffs that they were about to receive significant compensation, but defendants' representations were all untrue.  And defendants have unquestionably violated the Fair Labor Standards Act and the applicable state wage and hour laws by forcing plaintiffs to work without pay.

80.     Defendants' unlawful conduct was willful and without justification.  At minimum, defendants acted with a willful disregard of plaintiffs' rights.

81.     Defendants' unlawful conduct has caused plaintiffs millions of dollars in damages, which should be trebled under applicable law.

82.     As a result of defendants' unlawful conduct, plaintiffs are entitled to declaratory relief, injunctive relief, compensatory damages, emotional distress damages, contractual damages, statutory and liquidated damages, treble damages, punitive damages, nominal damages (in the event other monetary damages are not awarded), pre-judgment and post-judgment interest, reasonable attorneys' fees and the costs of the action, any damages allowable by law, rule, or regulation, and such other, further, or different relief as the Court deems just and proper.

# FIRST CAUSE OF ACTION
## Fair Labor Standards Act – Minimum Wages
### (all defendants)

83.     Plaintiffs reallege and reiterate the allegations contained in all preceding paragraphs.

84.     Defendants have engaged in a pattern and practice of violating the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et. seq.*, as detailed in this Complaint.

85.     At all relevant times, defendants have been an employer engaged in interstate commerce and/or in the production of goods or services for commerce.  At all relevant times, defendants employed the plaintiffs and other employees.  The individual defendants named herein are liable for the violations of the Fair Labor Standards Act by virtue of the fact that they are owners, members, directors, or officers of the entity defendants.

86.     Defendants were required to pay plaintiffs at least the applicable minimum wage for all hours worked.

87.     Defendants failed to pay plaintiffs at least the applicable minimum wage for all hours worked.

88.     Defendants' unlawful conduct as described in this Complaint has been willful and intentional.  Defendants were aware or should have been aware that the employment practices they undertook as described in this Complaint were unlawful.  Defendants have not made a good faith effort to comply with the FLSA.

89.     As a result of defendants' willful and intentional conduct, plaintiffs have suffered damages by being denied minimum wages in accordance with the FLSA in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated

and statutory damages, nominal damages, declaratory relief, injunctive relief, pre-judgment interest, post-judgment interest, attorneys' fees and costs, and other compensation pursuant to 29 U.S.C. §§ 201 *et. seq.*, or provided for by applicable law.

## SECOND CAUSE OF ACTION
### Fair Labor Standards Act – Overtime Wages
### (all defendants)

90.     Plaintiffs reallege and reiterate the allegations contained in all preceding paragraphs.

91.     The overtime provisions set forth in the FLSA, 29 U.S.C. §§ 201 *et. seq.*, and the supporting federal regulations, apply to defendants and protect plaintiffs with respect to plaintiffs' entitlement to overtime compensation.

92.     Plaintiffs routinely worked in excess of 40 hours per week during some or all of the workweeks in the relevant period.

93.     Defendants willfully failed to pay plaintiffs one-and-one-half times their regular and customary hourly rate for all hours worked in excess of 40 hours per workweek.

94.     Defendants unlawful conduct was willful and intentional. Defendants were aware or should have been aware that the employment practices they undertook as described in this Complaint were unlawful. Defendants have not made a good faith effort to comply with the FLSA. The individual defendants are liable for the violations of the Fair Labor Standards Act by virtue of the fact that they are owners, members, directors, or officers of the entity defendants.

95.     Plaintiffs have suffered damages by being deprived of overtime compensation in accordance with the FLSA in amounts to be determined at trial, and are

entitled to recovery of such amounts, liquidated and statutory damages, nominal damages, declaratory relief, injunctive relief, pre-judgment interest, post-judgment interest, attorneys' fees and costs, and other compensation pursuant to 29 U.S.C. §§ 201 *et. seq.*, or provided for by applicable laws.

**THIRD CAUSE OF ACTION**
**North Carolina Wage and Hour Act**
**(plaintiff Daniel Fusco; all defendants)**

96.     Plaintiffs reallege and reiterate the allegations contained in all preceding paragraphs.

97.     The North Carolina Wage and Hour Act, N.C. Gen Stat. §§ 95-25.6 and 95.25.7, provide that an employer must pay minimum wages, and all wages due and owing to employees on their regular payday.

98.     Defendants failed to pay plaintiff Daniel Fusco minimum wages and also failed to pay him for all wages he earned on the date of his regular payday or the company's regular payroll day.

99.     As a result of defendants' breaches of the North Carolina Wage and Hour Act, N.C. Gen Stat. §§ 95-25.6 and 95.25.7, plaintiff Daniel Fusco has suffered damages. The individual defendants named herein are liable for the violations of the North Carolina Wage and Hour Act by virtue of the fact that they are owners, members, directors, and/or officers of the entity defendants.

100.     As a result of defendants' breaches of the North Carolina Wage and Hour Act, N.C. Gen Stat. §§ 95-25.6 and 95.25.7, plaintiff Daniel Fusco is entitled to declaratory relief, injunctive relief, compensatory damages, statutory and liquidated

damages, pre-judgment and post-judgment interest, and reasonable attorneys' fees and the costs of the action.

## FOURTH CAUSE OF ACTION
### Florida Wage Act
### (plaintiff Diane Fusco; all defendants)

101.     Plaintiffs reallege and reiterate the allegations contained in all preceding paragraphs.

102.     The Florida Wage Act, Florida Statute §448.110 *et. seq.*, provides that an employer must pay minimum wages, and all wages due and owing to employees on their regular payday.

103.     Defendants failed to pay plaintiff Diane Fusco minimum wages and also failed to pay her for all wages she had earned on the date of her regular payday or the company's regular payroll day.

104.     As a result of defendants breaches of the Florida Wage Act, Florida Statute §448.110 *et. seq.*, plaintiff Diane Fusco has suffered damages.  The individual defendants named herein are liable for the violations of the Florida Wage Act by virtue of the fact that they are owners, members, directors, and/or officers of the entity defendants.

105.     As a result of defendants' breaches of the Florida Wage Act, Florida Statute §448.110 *et. seq.*, plaintiff Diane Fusco is entitled to declaratory relief, injunctive relief, compensatory damages, statutory and liquidated damages, pre-judgment and post-judgment interest, and reasonable attorneys' fees and the costs of the action.

## FIFTH CAUSE OF ACTION
### Breach of Contract
### (all defendants )

106.    Plaintiffs reallege and reiterate the allegations contained in all preceding paragraphs.

107.    An employment agreement exists between plaintiff Daniel Fusco and defendant NorthPoint ERM LLC.

108.    An employment agreement exists between plaintiff Diane Fusco and defendant NorthPoint ERM LLC.

109.    Defendant NorthPoint ERM LLC breached its employment agreements with plaintiffs.

110.    The other defendants are liable for NorthPoint ERM LLC's breaches of contract because, among other things, NorthPoint ERM LLC was not an incorporated entity at the time the plaintiffs employment agreements were signed.

111.    As a result of Defendant NorthPoint ERM LLC's breach of plaintiffs' employment agreements, plaintiffs are entitled to damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### Fraudulent Inducement
### (defendants NorthPoint ERM LLC and the Executors/Administrators of the Estate of David Chapman)

112.    Plaintiffs reallege and reiterate the allegations contained in all preceding paragraphs.

113.    Defendants NorthPoint ERM LLC and David Chapman fraudulently induced plaintiffs to accept positions at NorthPoint by making the knowingly false statements described in this Complaint.

114. Mr. Chapman's knowingly false statements, and his concealment of material facts, fraudulently induced plaintiffs to accept positions with NorthPoint. Had plaintiffs known the true facts concerning NorthPoint's business, revenue, and governance, they would have never accepted positions with the company.

115. Mr. Chapman's false statements were made with the intent to deceive plaintiffs and induce them to accept positions with NorthPoint, and were successful in deceiving plaintiffs. Plaintiffs relied, to their detriment, on the false statements made by Mr. Chapman in determining to accept employment with NorthPoint.

116. Plaintiffs have been deprived of millions of dollars in compensation and benefits, and have suffered other damages, including without limitation, damages to their future job prospects and earning potential, by virtue of Mr. Chapman's knowingly false statements and concealment of material facts.

117. As a result of defendants' unlawful conduct, plaintiffs are entitled to declaratory relief, injunctive relief, compensatory damages, emotional distress damages, punitive damages, nominal damages (in the event other monetary damages are not awarded), pre-judgment and post-judgment interest, reasonable attorneys' fees and the costs of the action.

## SEVENTH CAUSE OF ACTION
### Fraud
### (all defendants)

118. Plaintiffs reallege and reiterate the allegations contained in all preceding paragraphs.

119.    Defendants fraudulently induced plaintiffs to continue working for NorthPoint by making the knowingly false statements described in this Complaint and by concealing material facts.

120.    Defendants committed fraud by lying to plaintiffs about NorthPoint's business, prospects, revenue, assets, corporate structure, and corporate procedures and formalities.

121.    Defendants' knowingly false statements and their concealment of material facts fraudulently induced plaintiffs to continue working for NorthPoint.  Had plaintiffs known the true facts concerning NorthPoint's business, revenue, and governance, they would have not have continued in their positions with the company.

122.    Defendants' false statements and fraudulent concealment of material facts were made with the intent to deceive plaintiffs and were successful in deceiving plaintiffs.  Plaintiffs relied, to their detriment, upon the false and fraudulent statements and actions of defendants.

123.    Plaintiffs have been deprived of millions of dollars in compensation and benefits, and suffered other damages, including without limitation, damages to their future job prospects and earning potential, by virtue of defendants' knowingly false statements and concealment of material facts.

124.    As a result of defendants' unlawful conduct, plaintiffs are entitled to declaratory relief, injunctive relief, compensatory damages, emotional distress damages, punitive damages, nominal damages (in the event other monetary damages are not awarded), pre-judgment and post-judgment interest, reasonable attorneys' fees and the costs of the action.

**EIGHTH CAUSE OF ACTION**
**Aiding and Abetting Fraud**
**(defendants Dungan, Rebecca Chapman, and Gaffey)**

125.    Plaintiffs reallege and reiterate the allegations contained in all preceding paragraphs.

126.    As described herein, David Chapman and NorthPoint fraudulently induced plaintiffs to accept positions with NorthPoint and repeatedly engaged in fraud during the course of plaintiffs' employment with the company.

127.    Defendants Dungan, Rebecca Chapman, and Gaffey aided and abetted, and fraudulently concealed, the fraud committed by David Chapman and NorthPoint.

128.    Among other things, Dungan, Rebecca Chapman, and Gaffey prepared and/or maintained the books and records of the company in a manner calculated to conceal the fraud, created, maintained, or withheld documents in a manner calculated to conceal the fraud, sent communications to company employees in furtherance of the fraud, and continued to perpetrate the fraud after Mr. Chapman's death.

129.    By their conduct, defendants Dungan, Rebecca Chapman, and Gaffey provided material aid to David Chapman and NorthPoint in their efforts to effectuate the fraud.

130.    Upon information and belief, defendants Dungan and Rebecca Chapman were motivated to continue and/or conceal the fraud committed by David Chapman because they are beneficiaries or have otherwise received or will receive certain benefits from Mr. Chapman's estate, including succeeding to his position in NorthPoint.  Upon information and belief, defendant Gaffey was motivated to continue and/or conceal the

fraud because he was Mr. Chapman's longtime accountant and has a close relationship with the Chapman family.

131.    By virtue of defendants' actions, they are personally liable for the fraud committed by David Chapman and NorthPoint.

132.    As a result of defendants' unlawful conduct, plaintiffs are entitled to declaratory relief, injunctive relief, compensatory damages, emotional distress damages, punitive damages, nominal damages (in the event other monetary damages are not awarded), pre-judgment and post-judgment interest, reasonable attorneys' fees and the costs of the action.

### NINTH CAUSE OF ACTION
**North Carolina Unfair And Deceptive Trade Practices Act**
**(plaintiff Daniel Fusco; all defendants)**

133.    Plaintiffs reallege and reiterate the allegations contained in all preceding paragraphs.

134.    Defendants, through their conduct, have breached the provisions of the North Carolina Unfair and Deceptive Trade Practices Act as codified in N.C. Gen. Stat. §§75-1.1, 75-16, and other related statutory provisions.

135.    Among other things, defendants engaged in a fraudulent scheme to induce plaintiffs and their other employees to work for them for no pay by misrepresenting the business, corporate governance, prospects, revenue, and assets, which constitutes an unfair and deceptive trade practice under the referenced statute.

136.    Defendants engaged in unfair and deceptive trade practices while engaging in commerce and for no lawful justification.  Defendants' unfair and deceptive trade practices effected commerce.

137. By virtue of defendants' violation of the North Carolina Unfair and Deceptive Trade Practices Act, plaintiff Daniel Fusco is entitled to treble damages.

138. As a result of defendants' unlawful conduct, plaintiff Daniel Fusco is entitled to declaratory relief, injunctive relief, compensatory damages, emotional distress damages, treble damages, nominal damages (in the event other monetary damages are not awarded), pre-judgment and post-judgment interest, reasonable attorneys' fees and the costs of the action.

## TENTH CAUSE OF ACTION
**Florida Unfair And Deceptive Trade Practices Act**
**(plaintiff Diane Fusco; all defendants)**

139. Plaintiffs reallege and reiterate the allegations contained in all preceding paragraphs.

140. Defendants, through their conduct, have breached the provisions of the Florida Unfair and Deceptive Trade Practices Act as codified in Florida Statute §501.201, and other related statutory provisions.

141. Among other things, defendants engaged in a fraudulent scheme to induce plaintiffs and their other employees to work for them for no pay by misrepresenting the business, corporate governance, prospects, revenue, and assets, which constitutes an unfair and deceptive trade practice under the referenced statute.

142. Defendants engaged in unfair and deceptive trade practices while engaging in commerce and for no lawful justification. Defendants' unfair and deceptive trade practices effected commerce.

143. By virtue of defendants' violation of the North Carolina Unfair and Deceptive Trade Practices Act, plaintiff Diane Fusco is entitled to treble damages.

144.     As a result of defendants' unlawful conduct, plaintiff Diane Fusco is entitled to declaratory relief, injunctive relief, compensatory damages, emotional distress damages, treble damages, nominal damages (in the event other monetary damages are not awarded), pre-judgment and post-judgment interest, reasonable attorneys' fees and the costs of the action.

## ELEVENTH CAUSE OF ACTION
### Veil Piercing
### (all defendants)

145.     Plaintiffs reallege and reiterate the allegations contained in all preceding paragraphs.

146.     Defendants have abused the corporate form of the entity defendants, have ignored or misused the corporate form of the entities for their own purposes and benefit, and have disregarded corporate formalities.

147.     Among other things, defendants failed to properly incorporate the entities, failed to maintain books and records of the entities, failed to hold Board of Director meetings and/or keep accurate minutes of such meetings, failed to properly document corporate transactions, failed to properly file tax and regulatory documents, failed to respect corporate formalities, and otherwise failed to treat the entities as having a separate corporate form.

148.     It is appropriate and lawful to pierce the corporate veil of the entity defendants (if one exists) and hold the individual defendants personally liable, jointly and severally, for all obligations and debts of the entity defendants, including the entity defendants' obligations to pay compensation to plaintiffs.

149.    Judgment should be entered in plaintiffs' favor and against the individual defendants, jointly and severally, for the damages incurred by plaintiffs.

## TWELFTH CAUSE OF ACTION
### Civil Conspiracy
### (all defendants)

150.    Plaintiffs reallege and reiterate the allegations contained in all preceding paragraphs.

151.    Defendants, as part of a conspiracy, concocted a scheme to deprive their employees of compensation through the unlawful and/or fraudulent conduct.

152.    Defendants conspired together, and worked together, for a common purpose to effectuate their fraudulent scheme to injure plaintiffs.

153.    Defendants are part of a civil conspiracy.

154.    As the Defendants are part of a civil conspiracy, it is appropriate and equitable, as an evidentiary matter, to hold each defendant responsible and liable for the acts of the other defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiffs respectfully request that this Court enter judgment in their favor and grant them the following relief:

(a)    declaratory relief declaring that defendants have engaged in the violations of the laws and statutes described above;

(b)    injunctive relief: (i) requiring the defendants to cease the unlawful conduct described in this action; (ii) requiring the defendants to pay to plaintiffs the damages incurred in this action; and (iii) preventing defendants from transferring, wasting, or

otherwise disposing of any assets of the entity defendants until plaintiffs have been paid the damages sought in this action;

(c) actual, compensatory, contractual, consequential, emotional distress, statutory, liquidated, treble, and punitive damages;

(d) all damages allowable by law, common law, statute, rule, or regulation;

(e) pre-judgment and post-judgment interest;

(f) reasonable attorneys' fees and costs of the action;

(g) nominal damages, if other monetary damages are not awarded; and

(h) such other, further, or different relief as the Court deems just, proper, or equitable.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues permitted to be tried by a jury.

Dated: July 3, 2015                    Respectfully Submitted,

                                       **STRIANESE, PLLC**

                                       By:/s/ Christopher R. Strianese
                                               Christopher R. Strianese, Esq.
                                               NC Bar # 46918
                                               chris@strilaw.com

                                               401 North Tryon Street
                                               10th Floor
                                               Charlotte, North Carolina 28202
                                               tel. 704-998-2577
                                               *Attorney for Plaintiffs*